**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Augustine F Romero, | No. CV-20-00507-TUC-AMM |
| Plaintiff, | **ORDER** |
| v. | |
| Tucson Unified School District, | |
| Defendant. | |

Pending before the Court is Defendant's Motion for Summary Judgment, which is fully briefed. (Docs. 106, 111, 114.) The parties submitted Statements of Facts pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 56.1(a)–(b). (Docs. 107, 111.) For the following reasons, the Court will grant Defendant's Motion for Summary Judgment in part and deny in part.

## BACKGROUND

Plaintiff Augustine Romero ("Plaintiff") brought this employment discrimination action pursuant to Title VII[1] and 42 U.S.C. § 1981 alleging Defendant Tucson Unified School District ("Defendant" or "TUSD") discriminated against him because he is Mexican American and Yaqui and retaliated against him because he publicly called the TUSD Governing Board "racist" after it voted not to renew his employment contract. (Doc. 44 at 23–27.) Plaintiff alleges the discrimination and retaliation occurred when TUSD failed to

---

[1] Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

1  hire him for any of the seven positions to which he applied after his contract ended.[2] (*Id.*)

2  After the close of discovery, Defendant moved for summary judgment on all claims. (Doc.

3  106.)

4  ### SUMMARY JUDGMENT STANDARD

5  The Court may grant summary judgment if the pleadings and supporting documents,

6  viewed in the light most favorable to the non-moving party, "show that there is no genuine

7  issue as to any material fact and that the moving party is entitled to judgment as a matter

8  of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

9  An issue is genuine when the disputed fact "could reasonably be resolved in favor of either

10  party." *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004) (citing *Anderson v.*

11  *Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)). A disputed fact is material if it "might

12  affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

13  ### FACTS

14  Plaintiff worked for TUSD from 1996 to 2018. (Doc. 111 at 6.) Plaintiff was the

15  primary author and head of TUSD's Mexican American Studies Program ("MAS"). (*Id.* at

16  7.) MAS became the subject of significant political debate and media attention after the

17  then Arizona Superintendent of Public Instruction publicly opposed the curriculum for

18  allegedly promoting racist views against Anglos. (Doc. 111-2 at 6–7.) Plaintiff, as a leader

19  of the program, was one of the central figures in this highly publicized conflict. (*Id.* at 6.)

20  Other key figures included Mark Stegeman and Michael Hicks, two members of the

21  Governing Board who strongly opposed MAS and Plaintiff's role. (Doc. 111 at 7.)

22  Stegeman and Hicks publicly expressed their opposition during Governing Board meetings

23  and even testified against TUSD and MAS at the Arizona State Legislature. (*Id.*; Doc. 111-

24  2 at 7, 65.) Hicks publicly referred to Plaintiff as "radical" and the negative feelings

25

26  [2] Although the briefing devotes significant attention to the non-renewal of Plaintiff's
contract in 2018, the only adverse action alleged in the Second Amended Complaint is

27  TUSD's failure to hire Plaintiff for the positions he applied for after his contract ended.
(*See* Doc. 111 at 5 ("While [the] non-renewal [of Plaintiff's contract] is no longer an

28  actionable claim in this case, it is contextually vital.").)

towards Plaintiff continued even after the height of the MAS conflict. (Doc. 111-2 at 65.)

From 2014 to 2018, Plaintiff served as Principal at Pueblo High School. (Doc. 111 at 6.) Plaintiff received the highest performance evaluations in this role and "did a really good job at Pueblo [High School] in a very difficult environment . . . ." (Doc. 111-2 at 49–60, 68.) In 2016, Plaintiff was involved in an incident alleging improper grade changing, but an external investigation concluded that Plaintiff "was not flouting law or policy intentionally." (Doc. 111 at 7–8.) The then Superintendent H.T. Sanchez, Jr. counseled Plaintiff and suspended him for two days on an unrelated issue. (*Id.* at 8.) In 2017, Plaintiff's annual employment contract was renewed for the 2017–2018 school year based upon the renewal recommendation of newly appointed Superintendent Dr. Gabriel Trujillo and the Governing Board's approval. (Doc. 111-2 at 7.)

In February 2018, Dr. Trujillo declined to award Plaintiff a $10,000 annual stipend that Plaintiff had previously received. (*Id.* at 10, 118.) In a letter notifying Plaintiff, Dr. Trujillo simply stated that he would not award the stipend because he could not locate a contract or a record of approval from the Governing Board. (*Id.* at 118.) However, in his deposition, Dr. Trujillo clarified that he never submitted the stipend renewal to the Governing Board because he believed, based on "professional common sense," that the Governing Board would neither consider nor approve the stipend. (*Id.* at 10.) He specified, "[t]here is a record of public comments in the media for a long period of time by three—at least three board members expressing serious concerns about [Plaintiff] . . . . [I]t probably is not probable that they're going to entertain a $10,000 compensation request for the principal." (*Id.*) These three board members were Stegeman and Hicks—who were still on the Governing Board in 2018—and Rachel Sedgwick. (*Id.* at 7; Doc. 111 at 9.) Dr. Trujillo explained that although he did not become superintendent until after the height of the MAS conflict, he reviewed Governing Board records upon his appointment and was familiar with the long-standing tension involving Plaintiff and the Governing Board.[3] (Doc. 111-2 at 6–

---

[3] Dr. Trujillo initially said in his deposition that he was not familiar with any issue that Plaintiff had with members of the Governing Board over MAS and then changed his statement. (Doc. 111-2 at 3.)

7.) Although Dr. Trujillo "didn't feel it would be a productive use of [] time to be bringing that stipend forward in that environment with that level of discontent by three board members," he stated that he did not feel the discontent towards Plaintiff in general was justified. (*Id.* at 10.)

In March 2018, Plaintiff's contract came up for renewal for the 2018–2019 school year. (*Id.* at 4.) As he did the year before, Dr. Trujillo recommended to the Governing Board that it renew Plaintiff's contract. (*Id.*) In fact, he recommended to renew Plaintiff's contract over the objection of the Assistant Superintendent of Secondary Schools, who was responsible for bringing forward recommendations to Dr. Trujillo. (*Id.* at 4–5.) In his deposition, Dr. Trujillo said he made this recommendation because: "I didn't have any – any disciplinary concerns about [Plaintiff]. I didn't have any evaluative concerns about [Plaintiff]. He performed the functions of principal at Pueblo High School fine, as well as I was concerned, to the extent that I made a recommendation for him to continue in the position of '18–'19." (*Id.* at 4.) He testified that he reviewed student achievement data, school letter grades, evaluations, supervision performance, teacher and employee retention, student enrollment, and school discipline when making renewal recommendations. (*Id.*)

The Governing Board initially voted to approve Dr. Trujillo's recommendations and renew Plaintiff's contract. (*Id.*) However, two days later, Hicks appeared on a local radio show and, when asked if approving Plaintiff's contract was a "positive thing for parents and students," he said, "I don't think so, but that's the superintendent." (Doc. 111 at 10.) Hicks continued, "Why do we hire a superintendent? Why doesn't the Board just run the entire damn district? We don't need a superintendent! We don't need any of them. I can tell you that if it had gone down the way it was supposed to go down, [Plaintiff] would not have a contract." (*Id.*) After his radio appearance, Hicks requested to add Plaintiff's contract to the agenda for the next Governing Board meeting. (*Id.*)

At that meeting, Hicks, Stegeman, and Sedgwick all voted to rescind Plaintiff's approved contract and not renew his employment. (*Id.*) No other administrator in the preceding two decades had failed to receive a renewed contract when recommended for

one by the superintendent. (*Id.* at 11.)

Multiple news outlets covered the vote. (*Id.*) Adelita Grijalva—who was a member of the Governing Board at the time and voted to renew Plaintiff's contract—told one news outlet that Stegeman and Hicks had been "very opposed" to Plaintiff beginning with the MAS conflict. (*Id.*) Plaintiff also spoke to the media and, discussing the Governing Board, said, "[t]his is a history of racism. That board is racist." (Doc. 111-2 at 137–38.)

In her deposition, Grijalva described TUSD from 2017 to 2019 as "an incredibly oppressive environment." (*Id.* at 70.) She said that the effect of actions by Stegeman and Sedgwick towards administrators was "intimidation." (*Id.*) Grijalva explained,

> I think that if you had been paying attention to the governing board meetings at all, you would – it was very clear who – that there were certain employees that they didn't have much respect for, and so retribution or retaliation was – I don't think that – I don't think that people were as concerned as they were when they saw what happened in 2018 with the nonrenewal. I think after that, it made it – it made – your position in the district could be said to be – you know, if the board members like you kind of thing, which is just a horrible – horrible for morale . . . . I think that there was a pervasive feeling of anxiety and fear about, you know, making sure you stayed off the radar of certain board members . . . . [W]e had staff members crying all the time. I mean it was very stressful. Very stressful time in our district and a really bad time.

(*Id.*) Grijalva also stated she believed the Governing Board's decision to rescind Plaintiff's contract was retaliatory. (*Id.* at 66.)

Janet Rico-Uhrig, the then TUSD Executive Director of Human Resources, echoed Grijalva's description when she testified that Hicks, Stegeman, and Sedgwick caused district employees to feel intimidated. (*Id.* at 33.) Rico-Uhrig was personally called before the Governing Board and described Sedgwick as "trying to bully [her] at the podium . . . ." (*Id.* at 32.) Rico-Uhrig further testified that district employees were concerned about retaliation if they did or said things that were not aligned with Hicks, Stegeman, and Sedgwick. (*Id.*) For example, on more than one occasion Hicks, Stegeman, or Sedgwick

submitted requests for information from administrators with "unreasonable" time frames and, according to Rico-Uhrig, "Dr. Trujillo was always very insistent that [they] deliver prompt responses." (*Id.* at 32.)

After the Governing Board rescinded his contract, Plaintiff applied for seven open positions with TUSD between 2018 and 2020. (Doc. 111 at 13.) Those positions included: Assistant Superintendent of Curriculum and Instruction, Job #8534; Assistant Regional Superintendent, Job #9143; Principal Pool, Job # 11865; Assistant Superintendent of Curriculum and Instruction, Job #11876; Assistant Regional Superintendent, Job #11882; Director of Student Relations, Job #12113; Director of Advanced Learning Experiences, Job #13085; and Assistant Superintendent of Equity and Inclusion, Job # 16400. (Doc. 107 at 1–2.) Plaintiff helped to create some of these positions during his tenure with TUSD.[4] (Doc. 111-2 at 67.)

The hiring process included (1) an initial screening for minimum qualifications; (2) a second screening for preferred qualifications; (3) initial panel interviews with various TUSD employees; and (4) finalist interviews with Dr. Trujillo. (Doc. 107 at 2; Doc. 111 at 2, 14.) Some of the positions also required a presentation component as part of the fourth phase. (Doc. 107 at 3.) Applicants who were selected for initial panel interviews appeared before a panel of approximately 36 people of diverse racial backgrounds, the majority of whom were TUSD employees who worked with or reported to Dr. Trujillo. (*Id.* at 6; Doc. 111 at 14.) The panel had a list of interview questions and an ideal response to each question developed by Dr. Trujillo. (Doc. 111 at 14.) After the interview, panel members assigned numerical scores to each candidate based on their assessment of the applicant. (Doc. 107 at 5; Doc. 111 at 4.) The interviewers were responsible for determining how closely a candidate's response aligned with the "ideal response" provided by Dr. Trujillo. (Doc. 111-2 at 28.)

---

[4] Plaintiff also applied for 28 positions outside of TUSD. (Doc. 107 at 8; Doc. 111 at 5.) For the 28 jobs outside of TUSD, Plaintiff only received interviews for six. (Doc. 111 at 16.) Plaintiff posits that he did not receive more interviews because he had to disclose that his contract with TUSD was rescinded. (*Id.*)

In his deposition, Dr. Trujillo said he had no input as to the first round of interviews, the questions asked, or the topics covered. (*Id.* at 12.) He indicated that he was not involved until the final round of interviews. (*Id.* at 17.) He also stated that he only "had a conversation conceptually about the expertise that was to be represented on the interview panel, not about people, not about positions." (*Id.* at 20.) Rico-Uhrig, however, testified that Dr. Trujillo was "the primary driver for questions, for the process." (*Id.* at 27.) She said Dr. Trujillo had "significant control over how the process played out" because he wrote the job description, he told Rico-Uhrig his list of preferred people for the interview panel,[5] he created the questions and ideal responses for the initial interviews, he selected the topic for the presentation, and he "ke[pt] tabs on who [was] making it from one round to the next." (*Id.* at 27–28, 30.) Rico-Uhrig, who also sat as a member of the initial interview panel for at least some of the positions, testified that she believed Dr. Trujillo's "level of involvement was out of the ordinary for a superintendent[,]" although she said she did not believe his involvement influenced her interview scores. (*Id.* at 37.) She explained that she "tried to ensure that the process was a fair and equitable one." (*Id.*)

The parties do not dispute that Plaintiff was qualified for the TUSD positions to which he applied. (*See* Doc. 107 at 5; Doc. 111 at 14.) Plaintiff has a PhD in Language, Reading and Culture. (Doc. 44 at 3.) In his Second Amended Complaint, Plaintiff avers he taught social studies and social justice at Tucson Magnet High School and Cholla Magnet High School from 1998 to 2011. (*Id.*) He also alleges that, from 2002 to 2013, he held various administrative positions at TUSD including Director of the Mexican American Studies/Raza Studies Department (i.e., MAS), Director of Student Equity, and Director of Multicultural Curriculum. (*Id.* at 3–4.)

For each of the positions to which he applied, Plaintiff passed the initial and

---

[5] Rico-Uhrig then vetted those recommendations to ensure that they complied with the requirements for racial and gender diversity set forth in the desegregation order entered against TUSD in 2011. (Doc. 111-2 at 11, 28.) While Rico-Uhrig assigned which individuals sat on the interview panels, she suggested that as long as they complied with the diversity requirements, she approved the panel recommended by Dr. Trujillo. (*Id.* at 11-12, 28–29.)

secondary screening for qualifications and participated in an initial panel interview. (Doc. 107 at 5; Doc. 111 at 4.) However, Plaintiff was not selected as a finalist for any position and did not participate in the final round of interviews with Dr. Trujillo. (Doc. 107 at 6–7; Doc. 111 at 4.) Plaintiff scored lower than the individuals selected for final interviews for each of the positions. (Doc. 107 at 6; Doc. 111 at 4.)

Early in the application process, Dr. Trujillo learned from Rico-Uhrig that Plaintiff applied to several open positions. (Doc. 111-2 at 26–27.) Rico-Uhrig testified that Dr. Trujillo "wanted to fail individuals from the search" including Plaintiff. (*Id.* at 26–27.) Specifically, when Rico-Uhrig read Plaintiff's name from the list of individuals who received an initial interview, "Dr. Trujillo's comment was, 'I won't ever let him get to the governing board.'"[6] (*Id.* at 27.) When Rico-Uhrig asked Dr. Trujillo what he meant, Dr. Trujillo responded that "he was not happy with [Plaintiff]'s performance as a principal and that he would not move his name to consideration for those higher-level positions . . . ." (*Id.*) Rico-Uhrig was "very surprised" and claimed she "recommended to Dr. Trujillo that the process needed to be – to play out and to be fair and equitable, and [she] told him that it was not a good idea to talk like – to have a specific negative statement about candidates." (*Id.*) Dr. Trujillo responded by telling Rico-Uhrig, "I can think however I please." (*Id.*) She testified that Dr. Trujillo limited his interactions with her after that conversation. (*Id.*)

Rico-Uhrig reported Dr. Trujillo's statements to Grijalva. (*Id.*) When Grijalva asked Dr. Trujillo, he first told Grijalva that it was not true and then said the process had to play out. (*Id.* at 69.) After Grijalva responded that she was surprised Plaintiff was not a finalist for jobs he was qualified for, Dr. Trujillo told her to trust the process. (*Id.*) Grijalva testified that she was concerned because there was no "systemic issue with hiring" but rather the issue was "specifically with [Plaintiff] because in other cases when [she] had questions about people that were moving through the process . . . [she] got reassurances." (*Id.*)

Ultimately, Plaintiff was not hired for any position with TUSD. Instead, TUSD hired 26 individuals consisting of 13 White individuals, 11 Hispanic individuals, and two African

---

[6] There is no evidence before the Court that Dr. Trujillo was deposed regarding his statements to Rico-Uhrig. (*See* Doc. 111-2 at 2–23.)

American individuals. (Doc. 107 at 7; Doc. 111 at 4.) The parties agree that most of the positions were filled by a single individual, while two were filled by multiple individuals, and three were filled by interim appointments. (Doc. 107 at 7; Doc. 111 at 4.)

## **DISCUSSION**

An employer is prohibited from discriminating against an employee based on race or national origin. *See* 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 1981. If there is no direct evidence of discrimination, the Court applies the three-part burden shifting test outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). The same test applies in Title VII and § 1981 cases. *See Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103, 05 (9th Cir. 2008).

Under this test, a plaintiff must first establish a prima facie case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. The degree of proof necessary to establish a prima facie case at summary judgment is minimal. *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1094 (9th Cir. 2005) (citing *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994); *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 659–60 (9th Cir. 2002)). If the plaintiff outlines a prima facie case, the burden of production then shifts to the defendant to put forth legitimate, nondiscriminatory reasons for the challenged action. *McDonnell Douglas Corp.*, 411 U.S. at 802. Once the defendant offers legitimate, nondiscriminatory reasons, "any presumption that the defendant discriminated 'drops from the case,' and the plaintiff must then show that the defendant's alleged reason . . . was merely a pretext for discrimination." *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 743 (9th Cir. 2004). The plaintiff must provide specific and substantial proof that the defendant's proffered reasons are not only false but also that discrimination was the true motive. *See Zelaya v. Coca-Cola Co.*, 158 F. App'x 809, 811 (9th Cir. 2005) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)); *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998) ("Such evidence of 'pretense' must be 'specific' and 'substantial' in order to create a triable issue."). "The burden of persuasion, as opposed to production, however, remains with the plaintiff at all times." *Bodett*, 366 F.3d at 743.

1

## I.       Discrimination - Disparate Treatment

2       Plaintiff alleges Defendant's failure to hire him because he is Mexican American

3 and Yaqui[7] constitutes disparate treatment under Title VII and § 1981. (Doc. 44 at 24.) "To

4 show a prima facie case of disparate treatment, a plaintiff must offer evidence that 'give[s]

5 rise to an inference of unlawful discrimination.'" *Reynaga v. Roseburg Forest Prods*., 847

6 F.3d 678, 690 (9th Cir. 2017) (quoting *Sischo-Nownejad v. MercedCmty. Coll. Dist.*, 934

7 F.2d 1104, 1110 (9th Cir. 1991)). A plaintiff may do so by showing "(1) the plaintiff

8 belongs to a protected class, (2) he was performing according to his employer's legitimate

9 expectations, (3) he suffered an adverse employment action, and (4) similarly situated

10 employees were treated more favorably, or other circumstances surrounding the adverse

11 employment action give rise to an inference of discrimination." *Id.* at 691; *see also*

12 *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004) (applying standard to

13 § 1981 claims). A plaintiff "need produce very little evidence in order to overcome an

14 employer's motion for summary judgment. This is because 'the ultimate question is one

15 that can only be resolved through a searching inquiry—one that is most appropriately

16 conducted by a factfinder, upon a full record.'" *Chuang v. Univ. of Cal. Davis Bd. of*

17 *Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000) (quoting *Schnidrig v. Columbia Mach., Inc.*,

18 80 F.3d 1406, 1410 (9th Cir. 1996)).

19       Here, the undisputed evidence establishes that Plaintiff has met the first three

20 elements of a prima facie case for racial discrimination: he is Mexican American and

21 Yaqui, and therefore a member of a racial minority; he was qualified for the positions to

22 which he applied; and he suffered an adverse employment action by not being hired for

23 any of the positions. As to the fourth element, Plaintiff does not argue that similarly situated

24 individuals were treated more favorably. (Doc. 112 at 11–13.) Instead, he argues that other

25 circumstances give rise to an inference of racial discrimination, specifically Hicks's and

26

27

28

---

[7] To the extent that Plaintiff alleges racial discrimination based on his Yaqui ethnicity, the parties agree that Plaintiff does not know whether any of the people who he claims discriminated against him are aware he is Yaqui. (Doc. 107 at 10; Doc. 111 at 6.)

Stegeman's negative opinion of Plaintiff and their influence over Dr. Trujillo's actions. (Doc. 112 at 11–13.) The Court disagrees.

Although Plaintiff offered evidence that Stegeman and Hicks had a history of opposition to Plaintiff, he has not produced evidence that their opposition was because he is Mexican American and Yaqui. Instead, the evidence suggests that Hicks and Stegeman strongly opposed Plaintiff because of his curriculum. For example, although Hicks called Plaintiff "radical," Plaintiff has not shown that anyone made any racially discriminatory comments against him despite the highly public nature of his conflict with the Governing Board. *See Tusima*, 2023 WL 3344633, at *5 (explaining that plaintiff failed to show direct or circumstantial evidence of discrimination because, among other things, plaintiff did not claim any "employees made discriminatory comments against him"). Plaintiff has similarly failed to produce evidence that Dr. Trujillo refused to submit his name to the Governing Board or interfered with his applications because Plaintiff is Mexican American and Yaqui. The fact that approximately 40 percent of the individuals hired for the positions for which Plaintiff applied were also Hispanic further negates Plaintiff's argument that the circumstances suggest racial discrimination.

Accordingly, the Court finds that Plaintiff has failed to establish a genuine dispute of material fact as to the fourth element of a prima facie case of disparate treatment, and Defendant is entitled to summary judgment on this claim.

## II.    Retaliation

Plaintiff also alleges he engaged in a protected activity when he spoke out against the Governing Board, publicly calling them "racist," and TUSD retaliated when it did not hire him. (Doc. 112 at 17.) It is unlawful for an employer to retaliate against an employee "because he has opposed any practice" made unlawful by Title VII. 42 U.S.C.A. § 2000e-3(a).[8] To make a prima facie case of retaliation, a plaintiff must show "(1) he engaged in a

---

[8] The elements of a prima facie § 1981 claim for retaliation are the same as those for a Title VII claim. *See Surrell*, 518 F.3d at 1107. To state a claim under 42 U.S.C. § 1981, a plaintiff must identify a contractual relationship, under which the plaintiff has rights, that is impaired by intentional racial discrimination. *Domino's Pizza, Inc. v. McDonald*, 546 U.S.

protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action." *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000) (citing *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir. 1994)). A protected activity "includes not only opposing practices that are actually racially discriminatory but also opposing practices that the plaintiff reasonably believes to be racially discriminatory." *Becker v. Kikiktagruk Inupiat Corp.*, 488 F. App'x 227, 228–29 (9th Cir. 2012); *Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006). "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

The Court finds that Plaintiff has met the minimal burden of establishing a prima facie case of retaliation under Title VII and § 1981. Plaintiff's public criticism of the Governing Board for actions he reasonably believed were racially discriminatory—i.e., the nonrenewal of his contract—is a protected activity. He also suffered an adverse employment action when TUSD did not hire him for any position after his nonrenewal.

As to the third element, Plaintiff has established there is a triable issue of fact as to whether Plaintiff was not hired due to his statement that the Governing Board was "racist." Plaintiff put forth specific and substantial evidence that Hicks, Stegeman, and Sedgwick intimidated TUSD employees—likely including those who served on the interview panels—and created a "very stressful" environment where employees were wary of taking actions that were not aligned with these three board members, all of whom clearly opposed Plaintiff. The evidence shows that employees were specifically concerned about retaliation. Plaintiff also put forth evidence that Dr. Trujillo previously did not submit Plaintiff's

---

470, 476 (2006). "Such a contractual relationship need not already exist, because § 1981 protects the would-be contractor along with those who have already made contracts." *Id.* at 476. Defendants can be liable under § 1981 "when, for racially motivated reasons, they [prevent] individuals who sought to enter into contractual relationships from doing so." *Id.* (citation omitted).

stipend because he knew Hicks, Stegeman, and Sedgwick would not support it and ensured that his employees complied with even "unreasonable" asks from Hicks, Stegeman, and Sedgwick. Plaintiff further demonstrated that Hicks—unhappy with Dr. Trujillo's initial recommendation to renew Plaintiff's contract—went on the radio to criticize Dr. Trujillo and publicly question why TUSD needed a superintendent at all. Notably, there is evidence that, despite his statements to the contrary, Dr. Trujillo was highly involved in the hiring process and went so far as to tell Rico-Uhrig that he would not "ever let [Plaintiff] get to the governing board."

Defendant asserts that it had a legitimate nondiscriminatory basis for not hiring Plaintiff because he scored lower than the applicants who made it to the final round of interviews. (Doc. 106 at 11.) Although this is true, Plaintiff argues that TUSD's emphasis on his scores is merely pretext because the entire process—from the persons selected to serve on interview panels, to the questions asked, to the ideal responses against which interviewers graded his performance—was influenced by Dr. Trujillo and, therefore, tainted by animus towards Plaintiff.

At the pretext stage of the analysis, the Court finds there is a triable issue of fact regarding Dr. Trujillo's influence on the hiring process and whether Plaintiff's low scores were solely a result of his performance or qualifications, or whether they are a pretext for retaliation. After Hicks threated his job, Dr. Trujillo told Rico-Uhrig, "I won't ever let [Plaintiff] get to the governing board" and explained it was because he was "unhappy" with Plaintiff's performance as Principal at Pueblo High School. The Court highlights that Dr. Trujillo's explanation is inconsistent in two ways. First, Dr. Trujillo recommended that the Governing Board renew Plaintiff's principal contract twice (2017–2018 school year and 2018–2019 school year) after considering various performance measures. Second, in his deposition, Dr. Trujillo stated that he had no disciplinary or evaluative concerns about Plaintiff and that Plaintiff performed the role as principal well enough that Dr. Trujillo recommended renewal.

Granted, Dr. Trujillo's comment to Rico-Uhrig, standing alone, while troubling and

inconsistent, would not be sufficient circumstantial evidence of pretext; however, Dr. Trujillo did not make this statement in a vacuum. Dr. Trujillo had already endured direct and public criticism from the Governing Board when Hicks broadcasted that the Governing Board should "just run the entire damn district." This is particularly alarming given the climate of fear and stress that pervaded TUSD and caused employees to worry that they would lose their job if they upset Hicks, Stegeman, or Sedgwick. Furthermore, Dr. Trujillo's statement is noteworthy given that he played a role in the hiring process that was "out of the ordinary." Although Rico-Uhrig testified that she tried to make the hiring process fair and equitable, she did not state that the hiring process *was* in fact fair and equitable. Rico-Uhrig worked under Dr. Trujillo, served on the interview panel, and knew Dr. Trujillo did not favor Plaintiff for any position with TUSD. A jury should be permitted to gauge Rico-Uhrig's credibility and the extent to which Dr. Trujillo influenced the interviews and panel members. *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."). A jury should also have the opportunity to weigh Dr. Trujillo's credibility given the role he played in the hiring process and his conflicting statements.

Viewing the evidence in the light most favorable to Plaintiff, the Court finds Plaintiff has established a prima facie case of retaliation by creating a genuine dispute about whether Defendant's proffered reasons for not hiring him were pretextual based on public opposition to Plaintiff by Hicks, Stegeman, and Sedgwick and based on the fear-based interplay between the Governing Board, Dr. Trujillo, and other TUSD employees involved in hiring. Accordingly, the Court will deny summary judgment on Plaintiff's retaliation claims.

///

///

///

///

For the foregoing reasons,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part. (Doc. 106.) The Court grants summary judgment in favor of Defendant as to Counts I and III of the Second Amended Complaint. The Court denies summary judgment as to Counts II and IV.

Dated this 24th day of September, 2024.

Honorable Angela M. Martinez
United States District Judge